UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------x
                    :
MARIA E. RIVERA CINTRON, PLAINTIFF   :        3:05 CV 1045 (PCD)
                    :
V.                        :
                    :
JO ANNE B. BARNHART        :        SEPT. 18, 2006
COMMISSIONER, SOCIAL SECURITY   :
ADMINISTRATION           :
------------------------------------------------------x

<u>RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR REVERSAL OR REMAND OF COMMISSIONER'S DECISION AND DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE COMMISSIONER'S DECISION</u>

      This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), as amended, seeks review of a final decision, by the Commissioner of Social Security ["the Commissioner"], denying plaintiff Supplemental Security Income ["SSI"] benefits.

<u>I.  ADMINISTRATIVE PROCEEDINGS</u>

      On October 2, 2002, plaintiff Maria E. Rivera Cintron applied for SSI.  (<u>See</u> Certified Transcript of Administrative Proceedings, filed September 1, 2005 ["Tr."] 58-60; <u>see also</u> Tr. 147-48).  The Commissioner denied the application initially and upon reconsideration.  (<u>See</u> Tr. 40-54).[1]

      On April 1, 2003, plaintiff filed a request for a hearing before an Administrative Law Judge ["ALJ"].  (<u>See</u> Tr. 55-57; <u>see also</u> Tr. 111-13).   Such hearing was held before ALJ Bruce H. Zwecker[2] on November 23, 2004, at which plaintiff was represented by counsel.

---

[1] Since plaintiff is unable to communicate in English, <u>see</u> Section II <u>supra</u>, Spanish translations of plaintiff's documents are included in the transcript.  (<u>See, e.g.</u>, Tr. 45-46, 52-53).

[2] The ALJ's last name is also spelled "Zwacker" in the administrative record.  (<u>See, e.g.</u>, Tr. 247).

(See Tr. 14, 22, 23-26, 247-77; see also Tr. 39).[3]  On January 24, 2005,  ALJ Zwecker issued his decision finding that plaintiff does not have an impairment or combination of impairments that meets or equals one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 and plaintiff is "not disabled" under Medical-Vocational Rule 203.25 given that plaintiff has the residual capacity to perform the full range of medium work.  (See Tr. 8-22).  Plaintiff thereafter filed a request  for review of ALJ Zwecker's decision on January 27, 2005.  (See Tr. 7).[4]  Plaintiff's request for review was denied by the Appeals Council on April 27, 2005, rendering ALJ Zwecker's  decision as the final decision of the Commissioner.  (See Tr. 4-6).

Plaintiff filed her Complaint on June 30, 2005 (Dkt. #1), to which defendant filed her Answer on September 1, 2005.  (Dkt.#4).[5]  This case was  referred to this Magistrate Judge by United States District Judge Peter C. Dorsey on March 29, 2006.  (Dkts.##5-6).

On May 4, 2006, plaintiff filed her Motion to Reverse or Remand the Decision of the Commissioner and brief in support (Dkts. ## 11-12) and on July 5, 2006, defendant filed her Motion for an Order Affirming the Commissioner's Decision and brief in support.  (Dkt.#13).

For the reasons stated below, plaintiff's Motion to Reverse the Decision of the Commissioner (Dkt.#11) is **denied** and defendant's Motion for an Order Affirming the Commissioner's Decision (Dkt.# 13) is **granted.**

---

[3]There are three additional Notices of Hearing in the transcript, each of which set a different hearing date (August 12, 2004; April 26, 2004; February 12, 2004); however only one hearing was held.  (See Tr. 27-38).

[4]Although at the time plaintiff filed the request for review plaintiff was represented by counsel, she filed the request without notifying him; plaintiff's counsel submits he "was . . . about to" file a request for review on plaintiff's behalf.  (Dkt.#12, at 2).

[5]Attached to defendant's Answer is a certified copy of the transcript of the record, dated July 26, 2005.  (Dkt.#4).

## II.  FACTUAL BACKGROUND

Plaintiff was born on September 25, 1959; she is forty-seven years old. (See  Tr. 58, 80, 253).  Plaintiff was born and raised in Puerto Rico and has lived in Connecticut for approximately twenty years.  (See Tr. 154, 166, 224, 253).  Plaintiff has a tenth-grade education.[6]  (See Tr. 77, 182, 192, 253).  Although plaintiff is fluent and is able to read and write in Spanish, she is unable to communicate in English.[7]  (See Tr. 70, 155, 168, 253-55, 270-71).

Plaintiff has five children from "a previous serious relationship."[8]  (See Tr. 166; but see Tr. 224).  Plaintiff's oldest daughter died from AIDS.[9]  (See Tr. 153-54; see also Tr. 167, 182, 225).  Currently, plaintiff lives in an apartment with three of her children[10]; she is the primary care-giver for her children.  (See Tr. 102, 166-67, 196, 225, 230, 253).

On an average day, plaintiff takes her children to school, goes back home to take her medication,[11] rests, cleans around the house and then picks her children up at school.  (See

---

[6]Plaintiff testified that her education was through the tenth grade, although she additionally stated "well I went into the [eleventh grade], but [did not] finish."  (See Tr. 253).

Plaintiff also reported she completed the eighth grade and that she left school during the ninth grade.  (See Tr. 167, 224).

[7]As of October 2, 2002, plaintiff was enrolled in an "English as a Second Language" program sponsored by Catholic Family Services.  (See Tr. 77).

[8]Plaintiff reported that this boyfriend was an alcoholic who would "strike her daily"; plaintiff reportedly ended this relationship approximately six years ago.  (See Tr. 166; see also Tr. 224).

[9]In December 2002, plaintiff reported that her "oldest child died [five] years ago from an asthma attack."  (See Tr. 166).

[10]However, in a report dated March 8, 2002, plaintiff indicated that she lived "[with her] boyfriend."  (See Tr. 149-50).

[11]Plaintiff claimed that before her "illnesses, injuries or conditions," she was able to be on her feet for most of the day.  (See Tr. 103).

3

Tr. 103, 260-61).  Plaintiff performs most household chores although she "[has] to take [her] time and sit down from time to time" and she experiences problems concentrating "on just [one] thing."  (See Tr. 104, 109, 260-61).   Plaintiff's adult daughter helps her with some chores, like mopping the floor, and her minor children help her prepare meals.  (See Tr. 104, 261).  Plaintiff talks on the phone to her adult daughter and visits with her "mostly every weekend."  (See Tr. 104, 107).

Plaintiff does not have a driver's license because "sometimes [she] gets dizzy"; plaintiff either walks or uses public transportation to travel.  (See Tr. 105).  Plaintiff shops for groceries and toiletries about twice a month; a shopping trip takes plaintiff about three hours and plaintiff's daughter goes with her to help.  (See Tr. 106, 225, 261).  However, plaintiff is not able to pay bills or handle money in any capacity because "[she] get[s] nervous," which she claims is a result of her condition.[12]  (See Tr. 106-07).  Plaintiff neither smokes nor uses drugs,[13] though she consumes alcohol occasionally.  (See Tr. 151, 154, 167, 196, 225, 230).

Plaintiff has held two jobs: one as an assembler in a factory, and the other as a school cafeteria worker. (See Tr. 254-55).  From January 1998 to February 2001, plaintiff worked full-time as a factory assembler.  (See Tr. 72, 85, 87, 167, 192, 196, 224, 230, 254, 264-65, 269).  She described her work as "very detailed"; she made small airplane parts with a machine.  (See Tr. 72, 254, 264-65).  Plaintiff estimated that she had to sit and stand for most of the day during this job.  (See Tr. 72, 254, 264-65).  Plaintiff also estimated that the

---

[12]However, on October 21, 2003, it was noted that plaintiff "recognize[d] how to count change."  (See Tr. 225).

[13]However, plaintiff noted that when she was nineteen, she had "one episode of suicidal intent" in which she consumed pills and her stomach was pumped at a hospital; it is not clear what precipitated this action.  (See Tr. 167).

4

heaviest, as well as the most frequent, weight she lifted in that job was less than ten pounds. (See Tr. 87). Plaintiff testified that she had difficulty performing this job because of her vision as she was not able to see the "small little tiny crystals" that were to be placed in a mold. (See Tr. 254, 265).

Plaintiff also worked as a "lunch lady" at a school between 1999 and 2000, or for what plaintiff estimated as one year. (See Tr. 85-86, 224, 254, 269). She worked part-time, for about two hours per day, five days a week; plaintiff walked, stood and sat during work. (See Tr. 86, 263-64). Plaintiff estimated that the heaviest, and most frequent, weight that she lifted in that job was less than ten pounds. (See Tr. 86).

On September 20, 1999, plaintiff was seen at the fracture clinic at Yale-New Haven Hospital, where it was noted that plaintiff had a healed ankle fracture; plaintiff complained of global ankle pain. (See Tr. 146).[14] She was advised to continue with a "cam walker" and Motrin 600 mg. (See id.).

Just two weeks later, on October 4, 1999, plaintiff was seen again at the fracture clinic at Yale-New Haven Hospital. (See Tr. 144-45). Plaintiff had "improved from prior pain [but] still [complained of] global ankle pain." (See Tr. 144). It was recommended that plaintiff be "[weaned] off" the cam walker and take Motrin for her pain. (See id.).

On November 2, 1999, plaintiff was seen at Yale-New Haven Hospital for an initial evaluation of her ankle, from which a cast was removed one week before. (See Tr. 142-43). Plaintiff reported pain and weakness in her right ankle and she was concerned about swelling. (See Tr. 142). Plaintiff complained that injury interfered with her ability to perform housework because she "'[could not] 'lift [and] place heavy things'"; still, plaintiff

---

[14]In June 1999, plaintiff suffered a right ankle fracture. (See Tr. 142-46, 251).

was able to negotiate twelve to thirteen stairs at her home entrance, "one step at a time." (<u>See</u> Tr. 142).  Thereafter, plaintiff was seen at the Department of Rehabilitation Services at Yale-New Haven Hospital on November 2, 4, 9, 11, 16, 18, 22, 23 and December 20, 1999 for physical therapy, including therapeutic exercise, stretching, and ice.  (<u>See</u> Tr. 141).

On February 28, 2000, plaintiff was seen at the fracture clinic of Yale-New Haven Hospital for an injury she sustained to her right ankle when she fell on ice.  (<u>See</u> Tr. 136). Plaintiff was able to ambulate and no new ankle fractures were revealed in the X-rays.  (<u>See</u> <u>id.</u>).

On November 18, 2000, plaintiff was seen by Dr. Mary S. Bogucki at Yale-New Haven Hospital after slamming her left hand in a car door.[15]  (<u>See</u> Tr. 127; <u>see also</u> Tr. 135). Plaintiff  suffered a "[t]ransverse fracture at the proximal left proximal phalanx of the fifth finger"; plaintiff's status was "post trauma with pain."  (<u>See</u> Tr. 127).  Plaintiff's hand was placed in an aluminum splint which she wore at all times except when showering.  (<u>See</u> Tr. 135).

One month later, on December 20, 2000, plaintiff was seen by Dr. Raymond Pavlovich at Yale-New Haven Hospital.  (<u>See</u> Tr. 125-26, 134; <u>see also</u> Tr. 135).  Dr. Pavlovich found that plaintiff had "a transverse fracture at the base of the proximal phalanx of the fifth digit"; that "[c]allus formation [was] appreciated at the edges of the fracture line, which [was] still clearly visible[; that] [t]he fracture [was] minimally displaced ulnarly[; and] [t]he soft tissues surrounding the fracture [were] prominent, possible edematous."  (<u>See</u> Tr. 126). Dr. Pavlovich recommended that plaintiff receive physical therapy for her left hand, particularly the fifth digit.  (<u>See</u> Tr. 125).

---

[15]Plaintiff does not allege that her disability claim involves such injury she sustained to her left hand.  (Dkt.#12).

On January 3, 8, 10 and February 21, 2001, plaintiff was seen at the Department of Rehabilitation Services at Yale-New Haven Hospital  for physical therapy for her hand injury. (See Tr. 140).[16]  On January 3, 2001,[17] plaintiff was seen for an initial hand evaluation, at which she was diagnosed with a "[fifth] digit [proximal] phalanx [fracture]."  (See Tr. 138-39; see also Tr. 140).  It was noted that plaintiff found her work as an assembler difficult; thus, one of plaintiff's treatment goals was to be able to perform assembly work without difficulty.  (See Tr. 138-39).  It was further noted that plaintiff was wearing an "ulna gulten plaster splint."  (See also Tr. 139).  On  January 10, 2001,[18] it was noted that plaintiff had made "significant gains in active flex" and that generally plaintiff was "doing well."  (See Tr. 137).  On the same day, at the  Orthopedic Hand Clinic, it was noted that plaintiff "[had] minimal pain" and had been "faithful" to her physical therapy.  (See Tr. 133).

Plaintiff was not seen by medical personnel again until December 27, 2001, when she was seen at Hartford Hospital; it was noted that plaintiff had an "unclear [history of] epilepsy" and plaintiff's diagnosis was "[e]pilepsy [versus] pseudoepilepsy?" (See Tr. 151). It was further noted that plaintiff experienced "increasing headaches and dizziness 'like when [she] used to have [epileptic] attacks.'"  (See id.).

On March 8, 2002, plaintiff underwent an Initial Intake Assessment at the Neurology Department of Hartford Hospital.  (See Tr. 149-50).  Plaintiff complained of three seizures,

---

[16]Although the progress notes read "2000," plaintiff's hand injury did not occur until November 2000, suggesting that the rehabilitation notes are erroneously dated.  (See Tr. 127, 135, 140); see notes 17-18 infra.

[17]Although this report is dated "1/3/00," the report  references both plaintiff's visit to the clinic "[one month] ago" on December 20, 2000 and the hand injury she sustained "[five weeks] ago."  (See Tr. 138-39; see also Tr. 140).

[18]This report indicates that plaintiff visited the hospital on January 10, 2000 and February 21, 2001; it is clear that plaintiff's visit on January 10 was in 2001.  (See Tr. 137; see note 17 supra).

headaches that occurred about three to four times per week, and increasing dizziness for the previous three months. (See Tr. 149, 152-53). Plaintiff was medicated with Flovent and an Albuterol inhaler. (See Tr. 150). Plaintiff was diagnosed with depression and the reporting medical personnel noted that plaintiff's previous seizures occurred around age twenty-nine. (See Tr. 149). In a progress note dated on the same day, it was noted that although plaintiff had epilepsy since she was twenty-nine years old, she was never treated and her seizures "went away." (See Tr. 153; see also Tr. 151, 154, 192). Nevertheless, plaintiff reported that she felt the seizures "starting again." (See Tr. 153). Accordingly, later that day, plaintiff was sent for an assessment by Jennifer Jones, D.O., of her complaints of seizures and headaches. (See Tr. 152, 154-56).

Plaintiff described her headaches to Dr. Jones as "throbbing in nature [and] sometimes involv[ing] the whole head"; plaintiff also indicated that she "[s]ometimes" experienced visual blurring and spots before her headaches began and that during the headache, visual blurring as well as a feeling of disequilibrium "sometimes" occurred. (See Tr. 154). Plaintiff further reported that sleeping in a dark room and taking Tylenol and Motrin helped her headaches. (See id.). Additionally, plaintiff complained of depression, moodiness, "occasional cramping of her left hand" and "some" arthritic pain. (See id.). Dr. Jones conducted a motor examination that revealed full strength in plaintiff's upper and lower extremities. (See Tr. 155). Further, Dr. Jones found that plaintiff had an "independent and normal" gait and plaintiff's right Achilles reflex was zero out of four while her left Achilles reflex was a one out of four. (See id.). Dr. Jones concluded that "[t]here [was] no evidence of any [central nervous system] abnormality" and that "[b]y history, these symptoms sound as if they are classic migraines with aura." (See Tr. 155; see also Tr. 192). Plaintiff was

instructed to start Depakote ER 500 and Naproxen 375 mg for her headaches and migraines. (See Tr. 155).

On May 29, 2002, plaintiff's prescription of Depakote had not been refilled; although plaintiff had not taken the medication for the past month, it was noted that she had not had a headache.  (See Tr. 157).  Two days later, plaintiff was given a new prescription for Depakote.  (See id.).  On June 28, 2002 plaintiff was seen at Hartford Hospital, where she was assessed as having headaches and dizziness and directed to take Motrin PRN, Naprosyn and Depakote 250 mg.  (See Tr. 158-59).

On August 19, 2002, plaintiff was seen at Hartford Hospital, where it was noted that plaintiff complained of right ankle pain and edema at the site of her surgery and pin placement.  (See Tr. 123, 160).  It was recommended that plaintiff continue taking Tylenol for her pain and noted that a regular exercise program involving walking would be prescribed if her pain diminished.  (See id.).

On October 2, 2002, plaintiff completed a SSA Disability Report in which she cited "depression, migraines, asthma and screws in [her] right ankle due to a car accident []" as the illnesses, injuries or conditions that limited her ability to work; plaintiff claimed that her ability to work was limited because she had "a lot" of pain in her right leg, was always "crying for no reason," and she could not be around a lot of people.   (See Tr. 70-84; see also 85-92).  Plaintiff cited January 1, 1998 as the date her conditions first bothered her and February 1, 2001 as the date she became unable to work due to her conditions.[19]  (See Tr.

_____

[19]In an undated Claimant Statement, plaintiff claimed she had not worked since January 14, 2003.  (See Tr. 111-14).  Plaintiff also reported that she has been visiting Hartford Hospital once a month since January 2003 for depression, migraines, seizures, asthma and right leg pain.  (See Tr. 111-13).  At the hospital, plaintiff received "treatment and medication as needed," which included an injection in her right leg and prescription and nonprescription medications including Zoloft 100 mg, Topomax 200 mg, Ibuprofen 600 mg, Roxicodone 5mg, Albuterol 17g and Flovent 100 mcg.  (See Tr.

71, 80).  However, plaintiff also stated that she stopped working because her ex-boyfriend "beat [her] [everyday] when [she] tried to go to work and [she] [could not] handle work anymore."  (See Tr. 71).  Plaintiff indicated that she took Depakote 300 mg for her depression, Naproxen 250 mg for her pain and Albuterol for her asthma.  (See Tr. 76).  It was found that plaintiff had no difficulty with hearing, breathing,  communicating, understanding, coherency, sitting, standing, walking, writing or seeing.  (See Tr. 83).  It was noted that plaintiff had red sores on her arms, that she was "crying a little because of the death of her daughter" and that she was a "very pleasant woman."  (See Tr. 83).  The SSA recommended an onset date of October 2, 2002.  (See Tr. 80).

On November 22, 2002, plaintiff was examined by Dr. Deborah A. Walker at Hartford Hospital.  (See Tr. 121-22).  Dr. Walker noted that plaintiff had restricted range of motion of the right ankle, especially dorsal flexion, as well as tenderness of the ligament attachments of the talus and calcaneus.  (See Tr. 121).  Dr. Walker also noted that plaintiff had "ligament laxity of the medial (deltoid) ligaments" on her right ankle.  (See id.).  It was further noted that plaintiff experienced pain and difficulty in her ankle when she first woke, lasting about fifteen to twenty minutes before her ankle "[loosened] up"; in addition, plaintiff complained of pain in her right knee and hip, especially in the morning.  (See id.).  Dr. Walker instructed plaintiff to continue taking Tylenol.  (See id.).

On December 23, 2002, Inés Schroeder, Psy. D. conducted a psychological evaluation of plaintiff pursuant to a request of the Connecticut Disability Determination Service.  (See 166-69).  Plaintiff reported that she suffered from "severe"  pain in her right leg and back

---

114).

which began when she was working as a "maintenance person."[20]  (See Tr. 166).  Plaintiff

also reported that she suffered from epileptic attacks, asthma, migraines and depression, all

of which "began about five years ago."  (See Tr. 167).  Plaintiff indicated that she had  fallen

many times and hit her head "on occasion."  (See id.).   Dr. Schroeder found that plaintiff

was oriented, that her speech was clear, that she had minimal difficulties in concentration

and attention and that she had "no gross organic impairments"; however, it was also noted

that plaintiff's "affect seemed depressed."  (See Tr. 168-69).  Plaintiff scored twelve out of

fifteen on the Rey's Memory Test, which Dr. Schroeder interpreted as meaning "that

[plaintiff] was likely providing effort without exaggerating her difficulties."  (See Tr. 169).

In sum, Dr. Schroeder recommended that plaintiff would benefit from counseling, further

assistance in managing her pain, and a psychiatric evaluation to assess her need for

psychotropic medication.  (See id.).[21]

On December 31, 2002, plaintiff underwent a "Title XVI Initial" Mental Impairment

Case Summary in which Annette Pulcinella concluded that plaintiff's symptoms of depression

are "credible but they seem to be situational" and plaintiff has "no more than mild

impairments with respect to ADL[s]."  (See Tr. 182).

On January 2, 2003, Dr. Wilbur J. Nelson conducted a psychiatric review of plaintiff,

which covered the period from January 1998 to the date of the review.  (See Tr. 170-181,

183-183A).   Dr. Nelson found that plaintiff had "[i]mpairment(s) [n]ot [s]evere,"which

---

[20]The transcript, however, does not reveal that plaintiff held such "maintenance job." (See Tr. 166).

[21]Dr. Schroeder also noted that plaintiff stated that "she recently had a second surgery for [her] knee problems"; however, the transcript does not reveal that plaintiff had such knee surgeries or "knee problems." (See Tr. 166; but see Tr. 197).

included 12.04 Affective Disorders.[22]  (See Tr. 170).  However, plaintiff's depression was a medically determinable impairment that did not precisely satisfy the diagnostic criteria of a 12.04 Affective Disorder.  (See Tr. 173).  Dr. Nelson indicated that plaintiff had  mild degrees of limitation in daily living activities, social functioning and in maintaining concentration, persistence or pace.  (See Tr. 180).  Plaintiff did not have episodes of decompensation of extended durations.  (See id.).

On January 6, 2003, in a residual functional capacity assessment, Dr. Steven Paul Edelmen diagnosed plaintiff with ankle pain, headaches and asthma.  (See Tr. 184-91).  He found that plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds; plaintiff could stand, walk or sit for about six hours in an eight-hour workday.  (See Tr. 185).  Further, with regard to pushing or pulling, Dr. Edleman noted that plaintiff was limited in lower extremities, specifically her right ankle.  (See id.).  Additionally, according to Dr. Edelman, plaintiff could never climb a rope, but could climb other things "occasionally."  (See Tr. 186).  While plaintiff was not found to have any manipulative, visual or communicative limitations, it was noted with regard to environmental limitations that plaintiff should avoid concentrated exposure to "[f]umes, odors, dusts, gases, poor ventilation, etc.," due to her history of asthma.  (See Tr. 187-88).

On January 14, 2003, plaintiff filed a Reconsideration Disability Report to SSA.  (See Tr. 93-98).  Plaintiff reported that she had felt worse since her previous claim, i.e., plaintiff experienced "more" depression and migraines, and her nerves "seemed to be worked up more."  (See Tr. 93).  Plaintiff claimed that she "[could not] stand long or walk long because of [her] leg and asthma" and that she experienced epileptic seizures.  (See id.).  Plaintiff also

---

[22]Listing 12.04 Affective Disorders is defined, in part, as a "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome."  (See Tr. 173).

reported that a physician at Hartford Hospital found her leg to be "very swollen" and consequently advised her not to climb stairs and to try to stay off of her leg "as much as possible." (See id.). Plaintiff indicated that due to her leg condition, her children helped her cook, clean and perform chores; however, plaintiff takes care of her personal needs, albeit "[she] just take[s] longer to complete things." (See Tr. 95; see also Tr. 103).

On January 27, 2003, plaintiff completed a Connecticut Disability Determination Services Symptom Questionnaire. (See Tr. 99-110). With regard to her symptoms, plaintiff claimed that "[her] leg feels num[b] and . . . gets swollen, but at the same time it hurt[s]." (See Tr. 99). Plaintiff described her symptoms as a "hard[,] throbbing pain" located on her leg. (See id.). Plaintiff's symptoms begin when she goes up and down stairs or is on her feet; plaintiff's symptoms are exacerbated when she stands up for a long time. (See Tr. 99, 108). Plaintiff stated that she experienced symptoms "[everyday] mostly all the time depending [on whether she was on her] feet." (See Tr. 100). Plaintiff reported that her symptoms lasted "[f]or a long time" and rated them a ten on a scale from one to ten; plaintiff's symptoms were alleviated when she sits down and puts her leg up. (See id.). Plaintiff reported that her condition affects her ability to climb stairs, lift, stand, squat and kneel. (See Tr. 108). Plaintiff claims that she uses crutches when she walks long distances; plaintiff can walk about five to ten minutes before she has to stop to rest for about fifteen to thirty minutes. (See Tr. 108-09). Plaintiff stated that "[she] sleep[s] on and off because [she has] to keep [her] leg elevated." (See Tr. 103). Plaintiff takes Depakote and Naproxen; she sets a clock as a reminder to take her medication. (See Tr. 100, 103, 109).

The next day, at Hartford Hospital, plaintiff complained of "severe" pain in her right ankle. (See Tr. 195). Plaintiff was assessed to have ligament laxity and enthesopathy of the

13

right ankle[23] as well as a "[s]prain/[s]train of the ankle"; plaintiff also had decreased mobility in her right ankle and tenderness over the medial maleoli.  (See id.).  Plaintiff was given an injection for pain control and it was noted that plaintiff's "pain decreased from 10/10 to 0/10."  (See id.).

On February 5, 2003, Dr. Mark Polatnik conducted a physical in which he concluded that an assistive device was not necessary for plaintiff to ambulate.  (See Tr. 196-98).  It was noted that plaintiff had "tenderness over the medial malleolus to touch but no gross deformity" and "pain on inversion and eversion."  (See Tr. 197).  It was also noted that plaintiff's knees had "mild crepitus on full extension, however, range of motion [was] preserved."  (See id.).  Dr. Polatnik noted that plaintiff's motor, sensory and cerebellar exams were normal, but that plaintiff had a "mildly antalgic" gait. (See id.). Plaintiff's cardiovascular, gastrointestinal, endocrine and neurological exams were normal; plaintiff's pulmonary exam was also normal although it was noted that plaintiff had "[s]hortness of breath with asthma attacks but [there had been] none recently."  (See id.).

On February 19, 2003, in a residual functional capacity assessment done by Dr. Maria Lourdes T. Lorenzo; plaintiff was diagnosed with "SLP" of the right ankle and asthma, and migraines were also noted.  (See Tr. 199-207).  Dr. Lorenzo found that plaintiff could occasionally lift twenty pounds and frequently lift and/or carry ten pounds; it was also noted that plaintiff could stand, walk or sit for about six hours in an eight-hour workday and that plaintiff had an unlimited pushing and/or pulling capacity.  (See Tr. 200).  Further, it was found that plaintiff could frequently do things such as balance, kneel, crouch or crawl but

_____

[23]The decreased mobility is noted as "secondary to surgery."  (See Tr. 195).  Although plaintiff's surgical history is noted throughout the transcript, the records are not before the Court.  (See Tr. 151, 197, 224, 229-30, 246).

plaintiff could only occasionally climb.  (See Tr. 201).  While plaintiff was not found to have any manipulative, visual or communicative limitations, it was noted with regard to environmental limitations that plaintiff should avoid concentrated exposure to "[f]umes, odors, dusts, gases, poor ventilation, etc." due to plaintiff's history of asthma.  (See Tr. 202-03).  Dr. Lorenzo noted plaintiff's right ankle had neither edema nor deformity, although it was tender over the medial malleolus.  (See Tr. 201).  She noted that plaintiff had a "mildly antalgic" gait, though it was later noted that plaintiff had "[n]o sustained or persistent gait dysfunction."  (See Tr. 201, 204).   Dr. Lorenzo concluded that there was "no reason to suspect [that plaintiff had] epilepsy," plaintiff had no central nervous system abnormality and plaintiff's symptoms "[seemed to be] classic migraines with aura."  (See Tr. 206).

On March 28, 2003, in a Psychiatric Review Technique form for SSA, Robert P. DeCarli, Psy.D. assessed plaintiff as having migraines, asthma and pain, along with § 12.04 Affective Disorder, "[i]mpairment(s) [n]ot [s]evere."  (See Tr. 209-22).   Dr. DeCarli found that plaintiff's depression was a medically determinable impairment that did not satisfy the diagnostic criteria for an affective disorder.  (See Tr. 212).  With respect to plaintiff's § 12.04 Listing, he noted that plaintiff had "[m]ild" degrees of limitation in daily living activities, social functioning, and in maintaining concentration, persistence or pace; it was further noted that plaintiff's limitation had not resulted in extended episodes of decompensation.  (See Tr. 219, 221).

On April 3, 2003, plaintiff was seen at Hartford Hospital for "severe" pain in her right ankle.  (See Tr. 246).  The intake report reveals that plaintiff's right ankle had "decreased mobility and scars over both malleoli."  (See id.).  Plaintiff was assessed to have ligament laxity,  enthesopathy and a sprain/strain of her right ankle.  (See id.).  Plaintiff received a

15

diagnostic injection to her right ankle and then a follow-up injection on May 8, 2003.  (See Tr. 244-46).

On August 11, 2003, plaintiff was seen by Roger Clark, DO, at Hartford Hospital; plaintiff complained of left knee pain and continuing right ankle pain, though her ankle was "somewhat improved" from ligament injections.  (See Tr. 243).  Dr. Clark noted that plaintiff's Albuterol prescription would be refilled, per plaintiff's request.  (See id.).

On August 27, 2003, Dr. Darrin D'Agostino saw plaintiff at Hartford Hospital; plaintiff complained of pain in her right ankle, which was "worse at night especially when it [swelled] up." (See Tr. 241).  Dr. D'Agostino's orders included orthotic insoles for arch support and anti-embolism "Teds" stockings.  (See Tr. 241-42).  He also noted that plaintiff had mid-finger nail breaks that would be fortified; antifungal treatment and "removal" were to be considered.  (See Tr. 242).

On October 21, 2003, Rafael Mora de Jesus, Ph.D. conducted a psychological review of plaintiff in which he diagnosed plaintiff with dysthymic disorder, post traumatic stress disorder, somaticization disorder and mixed personality disorder.  (See Tr. 224-28).  Plaintiff complained of significant pain in her right leg, depressed mood, frequent headaches and stress related seizures.  (See Tr. 228).  Dr. de Jesus noted that plaintiff's mood  appeared to be "depressed with a full range of affect." (See Tr. 225).  Dr. de Jesus' behavioral observations of plaintiff were all normal, although he did note that it took plaintiff "some time" to do the calculations involved in an attention and concentration test.  (See id.).  Plaintiff complained of "vague auditory hallucinations" of her dead daughter, which Dr. de Jesus attributed to her grief and mourning.  (See Tr. 225, 228).  Plaintiff obtained an IQ score of sixty-three, which falls within the "Deficient" classification of overall cognitive

abilities.   (See Tr. 225).   Plaintiff was found to have mild impairments in naming, construction, calculation, reasoning, writing and executive functioning.  (See Tr. 226-27). Plaintiff obtained five out of fifteen on the Rey's test, which is "moderately indicative of presenting herself as worse than she actually [was]." (See Tr. 227).   Finally, Dr. de Jesus noted that plaintiff was medicated with Depakote, Naproxen and Albuterol.  (See Tr. 224).[24]

On November 28, 2003, Dr. Cary R. Freston conducted a disability examination of plaintiff for SSA in which he concluded that "[n]o abnormalities . . . [were] found excluding mild pain on range of motion of the right ankle . . . and neurologically, [plaintiff] is grossly intact."  (See Tr. 229-37).  Dr. Freston found that plaintiff had a remote ankle fracture, preserved function and  range of motion in her right ankle, and no abnormality in gait or balance.  (See Tr. 229-30).  Dr. Freston also found that plaintiff's asthma was "mild, intermittent, quiescent [and] nonproblematic at present." (See Tr. 230; see also Tr. 229). Upon evaluation of the medical evidence, Dr. Freston found that plaintiff's complaints of epilepsy were "less probable and [a] history of seizure disorder [was] not further elaborated." (See Tr. 229).  He noted that plaintiff received acupuncture for her right ankle pain and used the "above-the-knee type" compression socks.  (See Tr. 229-30).  Dr. Freston found that plaintiff could occasionally lift and/or carry up to fifty pounds and frequently lift and/or carry twenty pounds; further, plaintiff could stand and/or walk for about six hours in an eight-hour workday and plaintiff's ability to sit was not affected by her impairment.  (See Tr. 232-33). Dr. Freston noted that plaintiff's "[r]ight ankle pain [was the] only orthopedic condition partially limiting [her] lifting, carrying and standing ability."  (See Tr. 235).  Dr. Freston further found that plaintiff could frequently climb and balance, and occasionally kneel,

---

[24]Defendant cites that Dr. de Jesus estimated that plaintiff had a GAF rating of 65, referring to the "PY/Curr. 65/65" notation in Dr. de Jesus' report.  (Dkt.#13, Brief at 10, 16; See Tr. 228).

crouch, crawl and stoop.  (See Tr. 233).  Lastly, Dr. Freston found that plaintiff had no manipulative, visual, communicative or environmental limitations.  (See Tr. 234-35).

On January 19, 2004, plaintiff saw Dr. D'Agostino at Hartford Hospital.  (See Tr. 240).  Plaintiff complained of right ankle pain and depression which included "frequent crying [and] sadness."  (See id.).  Dr. D'Agostino noted that plaintiff took Motrin 800 mg for her ankle pain; it was recommended that plaintiff take Zoloft 50 mg, and Trazadone if she experienced difficulty sleeping.  (See id.).

 On June 28, 2004, Fanny M. Montero BSN, RN, of Hartford Hospital, wrote that plaintiff's "medical record shows she has diagnoses of: right ankle pain, asthma, and depression."  (See Tr. 238).   In a statement dated August 5, 2004, Dr. D'Agnostino of Hartford Hospital wrote that plaintiff continued to receive injections in her right ankle for the purpose of stabilizing her ligaments and increasing support.  (See Tr. 239).

_____On November 23, 2004, a hearing was held before ALJ Zwecker, at which plaintiff and medical expert Dr. Morton Solomon, a board certified internist, testified.  (See Tr. 247-77).[25]  Plaintiff estimated that she could stand for "a few minutes only" and that sitting bothered her because her leg became numb; plaintiff could walk for about fifteen to twenty minutes.  (See Tr. 267-68).  Plaintiff testified that for approximately the past year she had been going to Hartford Hospital every two months to receive injections to her right ankle.  (See Tr. 255).  Plaintiff then testified that the injections were a consequence of the "falling down" arch on her right foot, for which she also wore arch support in her shoes.  (See Tr. 256).  Plaintiff further testified that the injections, coupled with her pills, took away  her pain "for . . . [two] months until [she went] back for the next injection."  (See id.).

_____

[25]On November 23, 2004, a medical summary was prepared by plaintiff's counsel.  (See Tr. 116-20).

Plaintiff claims to have intermittent pain in her back,[26] asthma, and depression "[m]ost of the time." (See Tr. 257-58). Plaintiff also experiences migraines with corollary symptoms such as nausea and dizziness. (See Tr. 266-67). Plaintiff takes daily medication to sleep and for her asthma; plaintiff took Motrin for her ankle pain, ranging from twice a day to twice a week. (See Tr. 258, 262-63). Plaintiff then testified that she would not be able to perform cafeteria work because of her depression and that she would not be able to perform work as an assembler both because her ankle condition would not permit her to stand and because her medications caused her to be drowsy.[27] (See Tr. 265-66).

Dr. Solomon opined that plaintiff was not "impaired to a degree that meets the listings." (See Tr. 273). According to Dr. Solomon, plaintiff's "fractured ankle" is treated with several pain medications and with Glucose injections which allow her to "independently ambulate." (See Tr. 273). Dr. Solomon further opined that plaintiff has a "history of migraines which are being treated apparently effectively with Depakote," and that the records supported plaintiff's allegations of depression, which is being treated with Zoloft. (See id.). On the other hand, Dr. Solomon testified that there is no information about plaintiff's back pain, and while "the record does describe [plaintiff's] . . . flat foot . . ., [t]here's no information about the [foot] numbness that she describe[d]." (See id.). Furthermore, Dr. Solomon opined that while flat feet are painful, the condition usually does

---

[26]The transcript, however, does not reveal reports of plaintiff's back pain or any treatment. (See Tr. 257, 273; but see Tr. 166).

[27]Plaintiff later testified, however, that she ceased her work as an assembler "[b]ecause [she] had problems there with the father of [her] children," i.e., "[h]e tried to kill [her], [so she] had to leave his side." (See Tr. 269). Plaintiff also testified that she did not know whether she would still be working as an assembler if "the father of [her] children" was not working there. (See Tr. 269-70; see also Tr. 71). Plaintiff also testified, however, that after she left the assembler job, she "injured [her] foot more." (See Tr. 270). See note 43 infra.

19

not limit ambulation or standing.  (See Tr. 274-75).  Dr. Solomon stated that there was insufficient objective evidence in the medical record regarding plaintiff's standing capacity: there were no "x-rays of the ankle to indicate whether there [is] significant arthritis," examinations did not reveal a deformity of plaintiff's ankle and although there was some decrease in plaintiff's ankle function, and there was no inflammation.  (See Tr. 274). Moreover, Dr. Solomon opined that plaintiff's ankle pain seemed to be more related to swelling than to "any internal derangement of the ankle."  (See id.).  Dr. Solomon declared that the weakness plaintiff described in her ankle is usually related to a twist in the ankle or "small traumas to the ankle that break or tear the ligaments that support the ankle and cause the ankle to be swollen acutely" rather than the "ankle ligament laxity" for which other doctors have diagnosed plaintiff.  (See Tr. 275-76).  Finally, Dr. Solomon posited that the ligament tears he described cause the ankle to become "loose," increasing the tendency to "twist the ankle and fall on it."  (See Tr. 276).

## III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23

20

F. Supp. 2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).   However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.   See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).   Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.   See id.

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.   See 42 U.S.C. § 423(a)(1).   "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.   See 20 C.F.R. § 404.1520.   First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 404.1520(a).   If the claimant is currently employed, the claim is denied.   See 20 C.F.R. § 404.1520(b).   If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.   See 20 C.F.R. § 404.1520(c).   If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations ["the Listing"].   See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.   If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.   See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80.   If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work.   See 20 C.F.R. § 404.1520(e).

If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citing cases).  Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's residual functional capacity by using guidelines ["the Grid"].  The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the grid is used to dictate a conclusion of disabled or not disabled.  See 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations).  A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered.  See 20 C.F.R. § 200.00(e)(2).  If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity.  See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)(citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986)).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Zwecker found that plaintiff has not

22

engaged in substantial gainful activity since June 1, 1998, her alleged onset date of disability. (See Tr. 15). The ALJ determined that plaintiff has a "severe impairment" resulting from residuals of a right ankle fracture, which impose more than a minimal restriction on plaintiff's ability to perform basic work activities. (See id.). ALJ Zwecker then determined that plaintiff's depression, asthma and/or migraines are non-severe impairments given the absence of evidence that the conditions affected plaintiff's ability to perform work-related activities. (See Tr. 15-16). In light of the medical evidence and testimony of the medical expert, ALJ Zwecker determined that plaintiff did not have an impairment or combination of impairments that meet or medically equals one of the impairments contained in the Listing. (See Tr. 17, 21).

Regarding the fourth step of the five-step analysis, ALJ Zwecker found that plaintiff, a "younger individual" as defined in 20 C.F.R. § 416.963, has no transferable skills, is unable to communicate in English, and has not engaged in past relevant work for the relevant time period. (See Tr. 20). Next, ALJ Zwecker found that plaintiff's allegations that she is incapable of all work activity not credible and instead found that plaintiff retained the residual functional capacity to perform the full range of medium work[28] given that there was no evidence that plaintiff suffered any nonexertional limitations or restrictions;[29] accordingly, ALJ Zwecker concluded that a finding of "not disabled" was directed by Medical-Vocational Rule

---

[28]Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds," and standing, walking, and/or sitting for six hours each in an eight-hour workday. See 20 C.F.R. § 416.967(c); see Tr. 18.

Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." See 20 C.F.R. § 416.967(b).

[29]ALJ Zwecker also concluded that plaintiff has the ability to perform light and sedentary work since plaintiff had no limitations involving bilateral manual dexterity or in the ability to sit for extended periods of time. (See Tr. 18).

203.25.  (See Tr. 18, 20).  Finally, ALJ Zwecker concluded that there were jobs existing in significant numbers in the national economy that plaintiff was able to perform.  (See Tr. 21).[30]  In sum, the ALJ found that plaintiff was not under a "disability," as defined by the SSA, at any time through the date of this decision.  (See Tr. 14-22).

Plaintiff argues that ALJ Zwecker's conclusions that plaintiff has the residual functional capacity to perform medium exertional work, and that plaintiff's depression and migraines were non-severe impairments, are erroneous and are derived from the ALJ's "exclusive reliance" on non-treating sources.  (Dkt.#12, at 8).  In turn, defendant contends that there is substantial evidence in the medical record to support ALJ Zwecker's decision, and applying the applicable Grid rule reflecting plaintiff's age, education, and work experience, there are a significant number of jobs in the national economy that plaintiff could perform with her functional capacity to perform medium level work.  (Dkt.#13, Brief at 18-19).

A. PLAINTIFF'S DEPRESSION AND MIGRAINES

Plaintiff asserts that ALJ Zwecker erroneously concluded that plaintiff's depression and migraines were non-severe impairments that did not limit the range of work plaintiff could perform.  (Dkt.#12, at 8).  Plaintiff claims that ALJ Zwecker incorrectly relied upon  Dr. Solomon's testimony because neither the ALJ nor Dr. Solomon identified evidence indicating whether plaintiff's medication had been effective.  (Dkt.#12, at 10-11).  In response,

---

[30]In addition, ALJ Zwecker found that plaintiff's testimony was "credible only to the extent of finding a maximum functional capacity for medium work" and that plaintiff's allegations that she is incapable of all work activity were not credible when viewed against the medical evidence.  (See Tr. 18).  ALJ Zwecker accorded medical expert Dr. Solomon's testimony "great weight" because his testimony was "well supported and consistent with the record as a whole," and because Dr. Solomon is a board-certified physician who is well schooled in disability evaluation.  See 20 C.F.R. § 416.927.  (See Tr. 17).

Plaintiff does not contest the aforementioned findings regarding the weight accorded to Dr. Solomon's testimony.  (Dkt.#12).

defendant argues that the medical record reveals that plaintiff's depression and migraines did not cause "severe"[31] limitations.[32]  (Dkt. #13, Brief at 15-16).

Plaintiff's  complaints of headaches and migraines as well as symptoms of depression are well documented in the medical record.  (See Tr. 71, 93, 149, 151-52, 154, 167, 228, 240).  On December 27, 2001, plaintiff was seen at the Hartford Hospital Neuro Clinic for complaints of "headaches and dizziness"; she reported that she was diagnosed with epilepsy at age twenty-nine and the headaches and dizziness she was currently experiencing were "like when [she] used to have attacks."  (See Tr. 151).  There was a question as to her diagnosis ("Epilepsy v. pseudoepilepsy?"), and plaintiff was not prescribed any medication during this consult.  (See id.).  Three months later, on March 8, 2002,  Dr. Jones in the Neurology Department found that plaintiff's headaches, dizziness and history of symptoms "sound as if they are classic migraines with aura."  (See Tr. 155).   In October 2002, plaintiff reported "depression [and] migraines . . . " in her SSA Disability Report; specifically, plaintiff claimed her ability to work was limited because she was always "crying for no reason."  (See

---

[31]"An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities," e.g., "abilities and aptitudes necessary to do most jobs" such as walking, standing, sitting, seeing, hearing, speaking, understanding simple instructions and responding appropriately to work situations.  20 C.F.R. § 416.921(a)-(b).

[32]Defendant specifically relies upon the psychological examination conducted by Dr. de Jesus as evidence that plaintiff's depression was mild.  (Dkt.# 13, Brief at 16; see Tr. 224-28).  Defendant negates plaintiff's reliance on Dr. Schroeder's opinion that plaintiff was struggling with depression by indicating that at the time of Dr. Schroeder's exam in December 2004 plaintiff was not taking any psychotropic medication.  (Dkt.#13, Brief at 16-17; Dkt.#12, at 10).  Moreover, defendant argues that plaintiff disregarded some of Dr. Schroeder's significant findings, e.g., "that [p]laintiff had only minimal difficulty in concentration and attention and only mild difficulty with memory." (Dkt.#13, Brief at 17; see Tr. 166-69).  Furthermore, defendant relies upon Dr. DeCarli's conclusion that plaintiff's depression was not a severe impairment and that it caused merely mild restrictions in daily living activities, social functioning, and in maintaining concentration, persistence or pace. (Dkt.#13, Brief at 17; see Tr. 209-22).  Finally, defendant argues that plaintiff's headaches were "fairly well controlled" with medication and the record does not indicate that plaintiff's headaches "significantly limited [her] physical or mental ability to perform basic work activities."  (Dkt.#13, Brief at 17).

Tr. 70-84; see also Tr. 85-92).  However, the same report also reveals that plaintiff had no difficulty with communicating, understanding, coherency, sitting, standing, walking, writing or seeing.  (See Tr. 83).

Two months later, on December 23, 2002, plaintiff reported her history of migraines and depression to Dr. Schroeder who conducted a psychological evaluation of plaintiff for SSA.  (See Tr. 167).  Dr. Schroeder found that plaintiff was oriented, that her speech was clear, that she had minimal difficulties in concentration and attention and that she had "no gross organic impairments."  (See Tr. 168-69).  He also noted that plaintiff's "affect seemed depressed" and that plaintiff did not report taking medication or ever attending counseling. (See Tr. 167-68).  Dr. Schroeder reported that plaintiff scored twelve out of fifteen on the Rey's Memory Test, which Dr. Schroeder interpreted as meaning "that [plaintiff] was likely providing effort without exaggerating her difficulties."  (See Tr. 169).  It was Dr. Schroeder's opinion that plaintiff is "struggling with depression" from which episodes her migraines follow.  (See Tr. 167, 169).  Thus,  Dr. Schroeder recommended that plaintiff would benefit from counseling, and that she "may benefit from . . . a psychiatric evaluation to assess the need for psychotropic medication."  (See Tr. 169).

Plaintiff underwent a second psychiatric review for SSA one month later, from which Dr. Nelson concluded that while plaintiff exhibits symptoms of depression, her symptoms have only mild degrees of limitation on her daily living activities and social functioning, and in her ability to maintain concentration, persistence or pace.  (See Tr. 170, 173, 180).  A residual functional capacity assessment conducted by Dr. Edelman days later, on January 6, 2003, revealed consistent results. (See Tr. 184-91).  Although plaintiff reported at this time that she was experiencing "more" depression and migraines when she filed her

26

Reconsideration Disability Report on January 14, 2003, the medical records surrounding this time period do not support her claims.  (See Tr. 99-110; but see Tr. 170-81; 184-91). Rather a month later, in February 2003, Dr. Polatnik observed that plaintiff's neurological exams were normal;[33] Dr. Lorenzo reported that plaintiff's symptoms "[seemed to be] classic migraines with aura," but plaintiff was not found to have any manipulative, visual or communicative limitations, and Dr. Lorenzo concluded that there was "no reason to suspect [that plaintiff has] epilepsy." (See Tr. 202-03, 206).

On October 21, 2003, after conducting a psychological review of plaintiff for SSA, Dr. de Jesus concluded that plaintiff's mood appeared to be "depressed with a full range of affect," her ability to maintain attention and concentration appeared to be adequate and she had "no significant difficulties" with her ability to recognize and comprehend information. (See Tr. 225).  Additionally, while plaintiff complained of "vague auditory hallucinations" of her dead daughter, Dr. de Jesus attributed this to plaintiff's grief and mourning.  (See Tr. 225, 228).  Three months later, in January 2004, consistent with her previous self-reports, plaintiff reported to Dr. D'Agostino that she was suffering from depression, which included "frequent crying [and] sadness"; he prescribed Zoloft 50mg.  (See Tr. 240).  In addition to the foregoing, Dr. Solomon's testimony in November 2004 is consistent with above-referenced excerpts from the medical records which reveal that plaintiff is being treated with Zoloft for her depression and Depakote for her migraines, but that she is "not impaired to a degree that meets the [L]istings." (See Tr. 273).

In addition to her medical records, plaintiff's testimony supports a conclusion that plaintiff was able to function independently despite her claims of depression and migraines.

---

[33]Similarly, in November 2003, Dr. Freston reported that "neurologically, [plaintiff] is grossly intact." (See Tr. 229-37).

See 20 C.F.R. § 404.1529(c)(3)(i).  Plaintiff testified that she makes her children's beds, does laundry, and grocery shops with her adult daughter, and plaintiff reported to SSA that she could perform mostly all indoor and outdoor chores as well as take care of her personal needs.  (See Tr. 95, 104,  261).  Plaintiff also testified that sometimes she cries without knowing why but she cleans and tries to think about other things in order to feel better.  (See Tr. 258-59).[34]  However, plaintiff also testified that she does not think that she could "do any kind of job because of the depression and because of the leg." (See Tr. 265).

When there is conflicting evidence regarding a claimant's pain, an ALJ has the discretion to make credibility findings, which must be made in conjunction with an assessment of the medical evidence.  See McKiver v. Barnhart, 2005 WL 2297383, at *14 (D. Conn. 2005)(internal quotations & citations omitted).  "[I]t is the function of the ALJ and not the reviewing court to appraise the credibility of the claimant"; if an ALJ's findings are supported by substantial evidence, they must be affirmed.   Id. (internal quotations & citations omitted). To evaluate a claimant's symptoms and their effects on the claimant's functional limitations, an ALJ applies a two-part standard: (1) the ALJ "must determine whether the medical evidence establishes the presence of an impairment which could reasonably be expected to give rise to the symptoms alleged"; and (2) "[i]f so, the ALJ must

---

[34]This testimony is consistent with the January and March 2003 assessments made by Dr. Nelson and Dr. DeCarli who found that plaintiff had merely mild degrees of limitation in daily living activities, social functioning, and in maintaining concentration, persistence or pace.  (See Tr. 180, 219). See 20 C.F.R. § 416.920a(d)(1)(ratings of mild in the functional areas of daily living activities, social functioning, and concentration, persistence or pace generally warrant a finding of an impairment non-severe).  Dr. DeCarli also found that plaintiff's limitation had not resulted in extended episodes of decompensation.  See 20 C.F.R. § 416.920a(c)(4). (See Tr. 219).

Although ALJ Zwecker is not bound by the assessments of the SSA's psychologists, he is required to consider it. See generally 20 C.F.R. § 416.927(f)(2). Dr. DeCarli's assessment is consistent with the medical record as a whole; accordingly, ALJ Zwecker's reliance on his findings is not in error.

then assess the extent to which the symptoms interfere with the individual's ability to perform work-related tasks, considering factors such as the objective medical evidence, the claimant's daily activities, . . . medications taken, [and] treatment . . . ." Id. (citing SSR 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996)).

Plaintiff's complaints of symptoms such as pain do not in themselves establish her disability.  See 20 C.F.R. § 404.1529(a).  As stated above, although plaintiff's history of depression and migraines is well-documented, equally well documented is the failure of these symptoms and conditions to limit her ability to function or perform activities of daily living. Accordingly, in light of the substantial, consistent medical evidence that plaintiff's migraines and depression do not significantly limit her ability to perform basic work activities, ALJ Zwecker appropriately found that such impairments were non-severe.

B. PLAINTIFF'S RIGHT ANKLE

Plaintiff argues that in view of plaintiff's right ankle injury, ALJ Zwecker erred in concluding that plaintiff could walk or stand up to six hours in an eight-hour workday so as to be capable of medium exertional work.  (Dkt.#12, at 8).[35]  Plaintiff contends that the medical evidence indicates that plaintiff's ankle instability, osteoarthritis, ligament laxity and

---

[35]Plaintiff also asserts that ALJ Zwecker was "disingenuous" in finding that " 'there is no reference in the medical records [concerning plaintiff's] standing limitations'" given that the medical evidence does not indicate that plaintiff could stand or walk for six out of eight hours. (Dkt.#12, at 9-10; Tr. 18).  Defendant responds that plaintiff's assertion "misplaces the burden of proof for a disability claim." (Dkt.#13, Brief at 14-15).  Defendant posits that plaintiff bears the burden of proving that she is disabled, and in fact, a treating source never indicated that plaintiff could stand for six hours out of an eight-hour workday.  (Dkt.#13, Brief at 15).

As defendant correctly observes (see Dkt. #13, Brief at 14-15), plaintiff bears the initial burden of proof for a disability claim and indeed must provide medical evidence that establishes the existence of an impairment and the severity of such impairment during the alleged period of disability. See 20 C.F.R. § 404.1512(c).  Thus, it is plaintiff's burden to establish, through the medical record as a whole, her standing limitations and, as discussed below, plaintiff fails to prove that her ankle condition precluded her from performing medium exertional work.

enthesopathy preclude such sustained standing and walking. (Dkt. #12, at 9). Moreover, according to plaintiff, the ALJ's finding that plaintiff's ankle symptoms were successfully controlled by surgery and follow-up treatment is belied by the fact that plaintiff continues to receive ankle injections more than five years after the injury occurred. (Dkt. #12, at 9-10).

In response, defendant posits that ALJ Zwecker's residual functional capacity finding that plaintiff could perform medium exertional work is supported by Dr. Freston's physical functional capacity assessment of plaintiff as well as by "the record as a whole." (Dkt.#13, Brief at 14). Moreover, defendant asserts that the ALJ properly found that plaintiff was not disabled because there remained a significant number of jobs in the national economy that she could perform.[36] (Dkt. #13, Brief at 18-19).

As an initial matter, the medical record reveals that plaintiff did not have a primary care physician. Although plaintiff's Hartford Hospital records indicate that Dr. Walker was plaintiff's primary care physician, the medical records reveal that plaintiff was only treated by Dr. Walker once. (See Tr. 121; but see Tr. 243-45). Moreover, although in a disability report dated October 2, 2002, plaintiff claimed that she saw Dr. Clark on a regular basis, plaintiff's medical records reveals that plaintiff saw Dr. Clark once, on August 11, 2003. (See Tr. 74, 243). Thus, although the Second Circuit directs that "[t]he opinion of a treating physician is given controlling weight if it is well supported by medical findings not inconsistent with other substantial evidence," Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir.

---

[36]Defendant asserts that the Grid rule for an individual under the age of 50, like plaintiff, who has limited education and no past work and has the RFC for medium level work or even for only light work, directs a finding of "not disabled" based upon the existence of a significant number of jobs in the national economy that she could perform. (Dkt. #13, Brief at 19). See 20 C.F.R. Part 404, Subpart P, App. 2, Table 3, Rule 203.25 & Table 2, Rule 202.16. The foregoing notwithstanding, defendant correctly observes that plaintiff does not allege that she would be unable to perform jobs existing in the national economy if she had the residual functional capacity to perform medium level work. (Dkt.#13, Brief at 18).

1999)(citations omitted), in the absence of a treating physician, the ALJ may consider other factors "in deciding the weight [to] give any medical opinion." 20 C.F.R. § 404.1527(d). Such factors to be considered include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist, and if it is, it is accorded greater weight; and (v) other relevant but unspecified factors. 20 C.F.R. § 404.1527(d). Additionally, "[g]enerally, . . . more weight [is given] to the opinion of a source who has examined [a claimant] than to the opinion of a source who has not examined [a claimant]." 20 C.F.R. § 404.1527(d)(1). Thus, the testimony of a SSA medical expert who never examined the claimant and who, on the basis of the medical records of the examining physicians, reaches an opinion opposite of those physicians, cannot, by itself, constitute "evidence sufficient to override [a] treating physician's diagnosis." Hidalgo v. Bowen, 822 F.2d 294, 298 (2d Cir. 1987). However, "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)(citation omitted).

In light of the foregoing, ALJ Zwecker appropriately afforded "significant weight" to Dr. Freston's medical opinion, which supports his conclusion that plaintiff is capable of performing medium exertional work. Although Dr. Freston noted that plaintiff's "[r]ight ankle pain [was the] only orthopedic condition partially limiting [her] lifting, carrying and standing ability" (see Tr. 235), he concluded that plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty pounds, and could stand and/or walk for about six hours in an eight-hour workday. (See Tr. 232-33).[37]

---

[37]See note 28 supra.

On February 19, 2000,  Dr. Lorenzo found that plaintiff could occasionally lift twenty pounds and frequently lift and/or carry ten pounds, and plaintiff could stand, walk or sit for about six hours in an eight-hour workday.[38]  (See Tr. 200).  On March 28, 2002, Dr. Jones found that plaintiff's gait was "independent and normal" and a motor examination revealed full strength in the upper and lower extremities.  (See Tr. 155).   In a SSA disability report dated October 2, 2002, it was noted that plaintiff had no difficulty sitting, standing or walking.   (See Tr. 83).   On January 6, 2003, Dr. Edelman found that plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds, and Dr. Edelman found that plaintiff could stand, walk or sit for about six hours in an eight-hour workday.  (See Tr. 185).[39]  One month later, Dr. Polatnik disclosed that he is "unclear as to the recent orthopedic evaluation of [plaintiff's] ankle," plaintiff's gait is "mildly antalgic," and plaintiff complains of pain in the right ankle, however, no assistive device in necessary for ambulation.  (See Tr. 197).[40]   Thereafter, on February 19, 2003, Dr. Lorenzo noted that plaintiff had a "mildly antalgic" gait, but that plaintiff had "[n]o sustained or persistent gait dysfunction."  (See Tr. 201, 204).   Eight months later, on October 28, 2003, Dr. Freston found that plaintiff had no gait abnormality.  (See Tr. 230).[41]

---

[38]As stated above, light exertional work"involves lifting no more than 20 pounds at a time with frequent lifting or carrying or objects weighing up to 10 pounds."  See 20 C.F.R. § 416.967(b).

[39]Dr. Lorenzo and Edelman examined plaintiff in connection to her disability proceedings.  (See Tr. 184-91, 199-206), and Dr. Freston and Dr. Polatnik submitted their reports after a physical examination of plaintiff to Connecticut Disability Determination Services to SSA.  (See Tr. 196-98, 229-35).

[40]ALJ Zwecker did not err in "fail[ing] to mention that Dr. Polatnik reported" that plaintiff had a "mildly antalgic" gait and pain with walking and movement with the ankle (see Dkt. #12, at 10), as his report, including this excerpt noted by plaintiff, is consistent with the medical record as a whole. (See Tr. 196-98).

[41]While Dr. Freston concluded that plaintiff is capable of performing medium exertional work, see note 28 and text accompanying note 37 supra, and Drs. Edelman and Lorenzo opined that plaintiff

Although plaintiff's complaints of "severe" pain in her right ankle are well documented in the medical record (see, e.g., Tr. 71, 93-94, 99, 123, 160, 166, 195, 228, 246), the medical evidence as well as plaintiff's testimony demonstrate that plaintiff's remaining pain and remaining injury to her right ankle do not interfere with her ability to perform medium exertional work.  While plaintiff's medical records first reveal complaints relating to her "global" ankle pain in September 1999, continuing through February 2000, during which she underwent physical therapy, plaintiff could ambulate and negotiate twelve to thirteen stairs at her home entrance, albeit "one step at a time." (See Tr. 136, 141-46).  Additionally, during this time period, plaintiff was able to continue working as an assembler. (See Tr. 264-65).  Thereafter, on November 22, 2002, Dr. Walker observed that plaintiff had restricted range of motion of her right ankle, and tenderness of the ligament attachments of the talus and calcaneus, and she diagnosed plaintiff with "ligament laxity of medial (deltoid) ligaments" on her right ankle.  (See Tr. 121).  However, Dr. Walker noted that plaintiff's ankle pain lasted for about fifteen to twenty minutes after she awoke in the morning before "lo[osening] up".  (See id.).  Dr. Walker also noted that plaintiff only reported pain and difficulty walking "when she [first awoke] in the [morning]."  (See id.).

Two months later, in January 2003, plaintiff claimed that she "[could not] stand long or walk long because of [her] leg and asthma," and that her symptoms were exacerbated when she stood up for a long time. (See Tr. 93).  Plaintiff rated her pain as a ten on a scale of one to ten. (See Tr. 100).   However, the medical notes taken on January 28, 2003 at Hartford Hospital indicate that the diagnostic injections plaintiff received to her ankle

is capable fo performing light external work, see note 38 and accompanying text supra, the SSA Regulations dictate a finding of not disabled under either circumstance.  See 20 C.F.R. Part 404, Subpart P, App. 2, Table 3, Rule 203.25 & Table 2, Rule 202.16.  See note 36 supra.

decreased her pain from "10/10 to 0/10."[42] (See Tr. 195). Plaintiff was seen again at Hartford Hospital in April 2003 for her "severe" pain and again she was diagnosed with ligament laxity, enthesopathy and a sprain/strain of her right ankle (see Tr. 195, 246); she received an injection during that visit and a follow-up injection one month later, on May 8, 2003. (See Tr. 244-46). Approximately three months later, on August 11, 2003, Dr. Clark found that plaintiff's ankle was "somewhat improved" from ligament injections, despite plaintiff complaints of continuing right ankle pain. (See Tr. 243). By November, 28, 2003, Dr. Freston concluded that plaintiff had only "mild range of motion of the right ankle" and preserved function in her right ankle. (See Tr. 229-31).

Plaintiff's self-reports and her testimony that due to her ankle injury she could only stand for a few minutes, walk for about fifteen to twenty minutes and that sitting bothered her (see Tr. 267-68), are inconsistent with the medical record as well as with plaintiff's previous testimony that her ankle injections coupled with her medication alleviated her pain (see Tr. 256), and that she could perform activities of daily living such as making beds, doing laundry, and grocery shopping with her adult daughter (see Tr. 260-61; see also Tr. 104).[43]

---

[42]Plaintiff first received the injections in her ankle at Hartford Hospital when she complained of "severe" pain in her right ankle and was diagnosed with a ligament laxity and enthesopathy, as well as a "[s]prain/[s]train of the ankle." (See Tr. 195).

[43]Additionally, plaintiff testified that she stopped working at her job in the cafeteria "[b]ecause [she] found the job . . . in New Haven . . . with more hours." (See Tr. 264). Plaintiff was able to do that job which involved sitting and standing, after her ankle injury occurred. (See Tr. 264-65). She claimed that a difficulty of the job was seeing "small little tiny crystals . . . to . . . put them in the . . . mold." (See Tr. 265).

Plaintiff later testified, however, that she ceased her work as an assembler "[b]ecause [she] had problems there with the father of [her] children," i.e., "[h]e tried to kill [her], [so she] had to leave his side." (See Tr. 269). Plaintiff also testified that she did not know whether she would still be working as an assembler if "the father of [her] children" was not working there. (See Tr. 269-70; see also Tr. 71). Plaintiff also testified, however, that after she left the assembler job, she "injured [her] foot more." (See Tr. 270).

34

See 20 C.F.R. § 404.1529(c)(3)(i).  Plaintiff also testified that sometimes she only requires medication for her ankle pain twice a week.  (See Tr. 263).

Thus, although the medical record does indicate that plaintiff has ligament laxity, enthesopathy and some restrictions in the range of motion in her right ankle, ALJ Zwecker's conclusion that "there is no objective evidence in the record" regarding a limitation in plaintiff's ability to stand, is supported by the medical record.  (See Tr. 17).  Additionally, as ALJ Zwecker observed, there is evidence in plaintiff's record that she ceased working for reasons unrelated to her alleged disability.[44]  (See Tr. 19).

## V.  CONCLUSION

For the reasons stated above, Plaintiff's Motion for Reversal or Remand of Commissioner's Decision (Dkt. #11) is **denied**, and defendant's Motion for an Order Affirming the Commissioner's Decision (Dkt. #13) is **granted**.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. §636(b)**(written objection to ruling must be filed within ten days after service of same)**; FED. R. CIV. P. 6(a), 6(e), & 72; Rule 2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).**

---

Moreover, in an SSA Disability Report completed by plaintiff on October 2, 2002, plaintiff stated that she stopped working because her ex-boyfriend "beat [her] [everyday] when [she] tried to go to work and [she] [could not] handle work anymore."  (See Tr. 71).

[44]See note 43 supra.

Dated this 18th day of September, 2006, at New Haven, Connecticut.


_____/s/_____
Joan Glazer Margolis
United State Magistrate Judge